Bv the Court.
 

 The single question of law requiring the consideration of this court at this time is whether the Court of Appeals was in error in holding this contract between the two corporations invalid.
 

 Of course the contract speaks for itself, but it is proper and important to note as briefly as possible a few of the many attendant and involved facts shown by the record. The following paragraphs from the factual conclusions of the Court of Appeals are illustrative :
 

 “8. The entire acreage acquired by the development company, including that quitclaimed to the cemetery association constituted one parcel of land and was acquired solely for the purposes of sale to the nonprofit cemetery association and was all planned and developed as a unit, there being nothing in its outward appearance to indicate that any part thereof was not owned, controlled and operated by the non-profit cemetery corporation. The main entrance thereto is on land held in the name of the development company.
 

 “9. Burial spaces of the total sales value of $528,494
 
 *637
 
 in the land quitclaimed to the non-profit cemetery corporation have been sold and there have been some burials on that portion of the land still in the name of the development company.
 

 “10. It was planned and contemplated that the sale of burial lots would yield $7,500,000 of which sum $750,000 would develop the cemetery, $750,000 would be placed in the cemetery perpetual care fund and $375,000 be used to bring the cemetery to a self-sustaining condition. The balance of the money received from the sale of burial lots was to belong to the development company, of which it would be necessary to expend approximately $1,825,000 in advertising and selling the burial lots. If the cemetery development proceeded as planned, it would result in a net profit of approximately $3,800,000. * * *
 

 “13. The two corporations occupied and now occupy the same offices, Mr. Yeager being president of each of them and the same person acting and serving as secretary of both of them. Yeager has been president and manager of the development company from its inception. That company employs agents to sell burial lots. The purchaser of a lot, if cash therefor is not paid, signs a contract with the cemetery association, which contract is retained by the development company, the deed for the lot when paid for being executed by the non-profit cemetery association. If the purchase price is paid in installments, the money passes through the books of the cemetery association to the development company to apply on its 90% contract interest therein and when paid in full the last 10% paid is credited to the non-profit cemetery association. The same bookkeeper keeps the books of both corporations and Mr. Yeager signs all checks drawn by either corporation. Money received from the sale of burial lots is paid to the cemetery association and immediately turned back by check to the development company.
 

 
 *638
 
 “14 Upon suggestion of Mr. Yeager, the board of trustees of the cemetery association at its first meeting provided by resolution for the investment in preferred stock of its contract 10% share of the money received from the sale of burial lots, in preferred stock of the development company, in consideration of which the latter company was to assume the maintenance and upkeep of the cemetery until its accumulated 10% was sufficient for that purpose. Under this arrangement the cemetery association at no time received or had in its possession any money from the sale of burial lots, preferred stock of the development company being given to it in lieu thereof. As collateral security for the preferred stock held by the cemetery association in lieu of its 10% of sales of burial lots, it holds $100,000 of the property of the development company, measured by its burial lot sales price.
 
 *
 
 * *
 

 “17. The salary and commission account of Mr. Yeager for the fiscal years ending August 31, 1929 to August, 1936, show:
 

 “Salary credits, 1929-30-31-32; 4 years at $15,000 per year....................... $60,000
 

 “Salary credits, 1933-34-35-36; 4 years at $10,000 per year....................... $40,000
 

 “Commission credits, 8 years, 1929 to 1936 inclusive.............................. $42,669
 

 “Total salary and commission credits for 8 years .................................$142,669
 

 “18. The cemetery association has nothing to do with the landscaping of the cemetery. That is directed by Mr. and Mrs. Yeager. Nor has the cemetery association any control over the development of the land for burial purposes. The development company makes a charge for opening and closing graves and keeps the money. It also sells vases, bronze plates and shrubbery. The laying out and platting of the land
 
 *639
 
 for cemetery purposes into burial lots, tbe engineering work, the laying out of the driveways and avenues therein, all improvements, developments, embellishments and adornment thereof have been done under the sple direction, control and supervision of Mr. Yeager as president and manager of the development company and has been paid for from the funds received from the sale of burial lots. The whole plan and development was conceived, dominated and controlled by Mr. Yeager, the primary purpose thereof being the profit to be made therefrom, the cemetery association at no time exercising or having any control thereover or any active part therein, it being merely the medium through which the development company operated and conducted its business of developing the land in question as a cemetery and the sale of burial lots therein.”
 

 A careful study of the record discloses an ample basis for these conclusions. The Ridge Hill Memorial Park was organized under favor of Sections 10093 to 10119-1, General Code. Section 10098 of this chapter reads in part as follows:
 

 “After paying for such land future receipts and incomes of such company or association, whether from sale of lots, donations, or otherwise, shall be exclusively applied to laying out, preserving, protecting and embellishing the cemetery, and avenues leading thereto, the erection of buildings necessary for the cemetery purposes, and to paying the necessary expenses of the cemetery company or association. No debts shall be incurred except for original purchasing, laying out, enclosing and embellishing the ground and avenues, for which debts may be contracted not exceeding ten thousand dollars in the whole, to be paid out of future receipts.”
 

 Then too, the following provisions appear in Section 10109 of the same chapter:
 

 “The receipts and income of such a company or as
 
 *640
 
 sociation, whether derived from the sale of lots, from donations, or otherwise, shall he applied to the payment for snch lands, to the laying ont, preservation, protection, and establishment of the cemetery, the avenues within it, to the erection of necessary buildings, and to the general purposes of such company or association. No debts shall be contracted in anticipation of future receipts, except for the original purchase of the land, and laying out, inclosing, and embellishing the grounds, and avenues therein. No part of the proceeds of land sold, or of the funds of such a company or association, shall ever be divided among its stockholders or lot-owners. All its funds must be used exclusively for the purposes of the company or association, as above herein specified, or invested in a fund the income of which shall be so used and appropriated. ’ ’
 

 In their brief the defendants express the suspicion that the decision of the Court of Appeals “was influenced by preconceived sentimental notions on the subject, rather than by rules of the law.” In view of the inescapable provisions of the above-quoted statutes, it is wholly unnecessary for any court to yield to that understandable temptation in considering eases of this sort. After even the most dispassionate appraisal of the record in this case one is impressed with the utter obviousness of this attempt to resort to the device of a corporate fiction for the indirect accomplishment of an objective positively prohibited by law.
 

 The decree of the Court of Appeals is manifestly correct and must be affirmed.
 

 Decree affirmed.
 

 Weygandt, C. J., Day, Zimmerman, Williams, Myers, Matthias and Hart, JJ., concur.